[Cite as *Karras v. Karras*, 2016-Ohio-8079.]

## IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

GIORGIO A. KARRAS, et al.                :
                                     :
  Plaintiff-Appellant/Cross-Appellee     :   Appellate Case No. 26814
                                     :
v.                                       :   Trial Court Case No. 14-MSC-161
                                     :
OURANIA M. KARRAS, et al.                :   (Probate Appeal from
                                     :    Common Pleas Court)
  Defendant-Appellee/Cross-Appellant    :
                                     :

. . . . . . . . . . .

# O P I N I O N

Rendered on the 9th day of December, 2016.

. . . . . . . . . . .

JAMES R. KINGSLEY, Atty. Reg. No. 0010720, Kingsley Law Office, 157 West Main Street, Circleville, Ohio 43113
     Attorney for Plaintiffs-Appellants/Cross-Appellees, Giorgio A. Karras,
     Maria A. Powers and Anastasios A. Karras

JAMES PAPAKIRK, Atty. Reg. No. 0063862, and HOWARD M. SCHWARTZ, Atty. Reg. No. 0024571, Flagel & Papakirk, LLC, 50 East Business Way, Suite 410, Cincinnati, Ohio 45241
     Attorneys for Defendant-Appellee/Cross-Appellant, Ourania Karras, Co-Trustee

JAMES L. JACOBSON, Atty. Reg. No. 0002031, Pickrel, Schaeffer and Ebeling, Co. LPA, 2700 Kettering Tower, Dayton, Ohio 45423-2700
     Attorney for Defendant-Appellee, Estate of Andreas G. Karras, Deceased

ELIZABETH E.W. WEINEWUTH, Atty. Reg. No. 0078113, Vorys, Sater, Seymour and Pease LLP, Suite 3500, Great American Tower, 301 East Fourth Street, Cincinnati, Ohio 45202
     Attorney for Defendant-Appellee, PNC Bank, National Association

. . . . . . . . . . . . .

HALL, J.

**{¶ 1}** Plaintiffs Giorgio Karras, Anastasios Karras, and Maria Powers (collectively the "Siblings") appeal from the trial court's entry of partial summary judgment in favor of their step-mother, defendant Ourania Karras, on their claim for declaratory judgment regarding whether certain assets were included in the estate of their deceased father, Andreas Karras, or whether the assets were part of a trust Andreas had established with Ourania long before his death.

**{¶ 2}** In a cross appeal, Ourania raises several arguments. First, she contends the trial court erred in finding that she and Maria each were entitled to 50 percent of a joint-and-survivor account that she maintains was part of the non-trust estate. Second, she claims the trial court erred in finding (1) that she bore responsibility for expenses related to her occupancy of the marital residence and (2) that she, despite being the surviving settlor-trustee, could not act independently of the plaintiffs, who were successor co-trustees. Third, she asserts that the trial court erred in holding that she could not prevail on a conversion counterclaim related to property removed from a safe.

**{¶ 3}** The facts underlying the present dispute accurately were summarized in the trial court's July 28, 2015 judgment entry as follows:

> On May 24, 2013, Andreas Karras ("Andreas") passed away, survived by his wife, Ourania Karras ("Ourania"), and his three children from a previous marriage, Maria Powers ("Maria"), Anastasios Karras ("Tom"), and Giorgio Karras ("Giorgio") (collectively the "Siblings"). Andreas' last will and testament (the "Will"), dated July 15, 1992, nominates Ourania as

executor of his estate (the "Estate") and pours all of the assets of the Estate into a trust dated the same day as the Will. The Will notes that all personal and household effects have already been transferred to the trust by operation of an Assignment of Furniture, Furnishings and Personal Effects (the "Assignment"), executed the same day. The Assignment recites that Andreas and Ourania have transferred all of their interest in personal property which they own, or may own in the future, to the trust. A Letter of Intent and Declaration of Gift (the "Letter of Intent"), also executed the same day, provides that all property held in the trust is commonly owned, unless otherwise designated in writing in the trust documents or in the manner in which title is held in the trust.

The trust referenced in the Will is the Andreas G. Karras Trust (the "Trust"), dated July 15, 1992. The Trust is a joint trust. During their joint lives, Andreas and Ourania are authorized to transfer property into and out of the Trust and to amend or revoke the Trust.

If Andreas predeceases Ourania, then upon his death, Ourania continues to serve as surviving trustee and the Siblings assume the duties of successor co-trustees. In that case, the trustees are directed to divide the commonly owned Trust assets into two shares, one designated Survivor's Trust A, which is revocable by Ourania, and the other designated Decedent's Marital Share, Trust B, which is irrevocable. To the extent the share designated Trust B exceeds the unified tax credit, the excess is to be administered under the terms [of] Trust A. The trustees are directed to

divide separately owned Trust assets differently. Ourania's separate Trust property is to be allocated to Trust A. Andreas' separate Trust property is to be divided into four equal shares; one share each to be allocated and distributed to the Siblings according to the terms of the Trust [footnote omitted], and one share to be held in trust for Ourania.

During Ourania's lifetime, she is entitled to all of the net income and principal from Trust A. From Trust B, she is entitled to all of the net income, the principal necessary for her maintenance and support, and annual payments of $5,000 or 5% of the value of the principal, whichever is greater. Additionally, she is entitled to remain in the couple's home (the "Residence") or to have the Residence sold in order to purchase other accommodations or to provide for nursing home care. Upon Ourania's death, the trustees are directed to distribute $15,000 to Ismirne Mixalatou, or if she predeceases distribution, to Joanne Mixalatou, if she is unmarried. The assets remaining in Trust A and Trust B are to be divided into equal shares and distributed to Andreas' and/or Ourania's children, if living, according to the terms of the Trust.

On December 29, 2005, Andreas and Ourania executed an Amendment to the Andreas G. Karras Trust Dated July 15, 1992 (the "Amendment"). The Amendment deletes the provisions creating Trust A and Trust B. Additionally, the Amendment modifies the allocation of Trust assets so that, upon Andreas' death, Ourania is to receive $200,000 in "liquid funds" from "[Andreas'] separate Trust property," free of trust, "in lieu of an

allocation of Trust assets to Trust A or Trust B." The remainder of Andreas' separate Trust property is to be divided into equal shares and allocated to the Siblings.

* * *

After executing the Estate Planning Documents, Andreas opened numerous retirement, investment, savings, and checking accounts, the majority of which were not titled in the name of the Trust, but rather were titled jointly with other owners and/or were designated as payable to one or more beneficiaries upon the death of the owner or owners. For instance, seven years after Andreas and Ourania executed the documents, in December 1999, Andreas opened an individual retirement account through Pioneer Investments ("Pioneer IRA"). On the application for the account, Andreas is listed as the owner and Ourania is listed as the sole beneficiary. Consistent with the forgoing, the financial advisor who assisted Andreas in establishing the account asserts that Andreas "affirmatively stated that he intended for these Pioneer IRA funds to benefit his wife, Ourania Karras, and that he had made provision for his children elsewhere."

Three years later, on February 15, 2002, Andreas and Ourania opened a checking account in their names ("PNC Checking 8872"). The paperwork indicates that Andreas, Ourania, and Maria are owners having rights of survivorship. On May 10, 2006, Andreas and Ourania opened another checking account in their names ("PNC Checking 0076"), with no other owners. On August 13, 2008, Andreas and Ourania purchased a

certificate of deposit, also titled in their names ("PNC CD 0897"). The paperwork indicates that Andreas, Ourania, and Maria are owners having rights of survivorship, and that Tom is a payable on death beneficiary. On August 25, 2008, Andreas opened a savings account in his and Maria's names ("PNC Savings 2432"). The paperwork indicates that he and Maria are owners having rights of survivorship, and that Ourania is a payable on death beneficiary.

During this time, Andreas also opened accounts titled in his name and accounts titled in the name of the Trust. For instance, on April 28, 2010, Andreas opened a checking account titled in his name ("PNC Checking 3086"), with no other owners. Although the dates on which they were opened is unknown, at least two other accounts ("PNC Investment 0674" and "Merrill Lynch 7127") were titled in Andreas' name, with no other owners, and various accounts with Wells Fargo were titled in the name of the Trust.

Shortly after Andreas' death, the Siblings and Ourania made several transfers from the accounts. On May 24, 2013, Maria withdrew $21,000 from PNC Checking 8872. Subsequently, she withdrew $60,000 from PNC Savings 2432. On August 13, 2013, Ourania closed PNC CD 0897 and transferred the proceeds to a checking account titled in her name.

(Doc. #100 at 2-5).

{¶ 4} In May 2014, the Siblings filed a complaint for declaratory judgment,

conversion, and removal of Ourania as a trustee. Among other things, they sought a declaratory judgment that various accounts (including accounts referenced above) were trust assets. They also alleged that Ourania improperly had converted the CD mentioned above when she closed the account and transferred the proceeds into her own checking account. Based on her actions, they sought Ourania's removal as a trustee.

{¶ 5} Ourania subsequently asserted several counterclaims. Specifically, she sought a declaratory judgment regarding her ability to act independently as a trustee, her ability to live in the marital residence expense free, and ownership of various accounts and assets. She also alleged conversion and concealment of property belonging to her, the estate, or the trust, and she requested an accounting. The parties filed competing motions for partial summary judgment and summary judgment on the respective claims and counterclaims. The trial court resolved these motions, and others, in a July 28, 2015 decision and entry (Doc. #100) from which the present appeal and cross appeal have been filed.

{¶ 6} As relevant here, the trial court granted Ourania summary judgment on the Siblings' declaratory-judgment claim regarding ownership of various accounts. Contrary to the Siblings' argument, the trial agreed with Ourania that the disputed accounts were not part of the trust. The trial court also found Ourania entitled to summary judgment on her declaratory-judgment counterclaim that she alone is entitled to the Pioneer IRA and PNC 0076 accounts mentioned above. The trial court concluded, however, that Ourania and Maria were entitled to split equally the balances remaining in PNC Checking 8872 and PNC CD 0897. With regard to Ourania's ability to act independently as a settlor-trustee, the trial court concluded that she was required to act jointly with the Sibling co-

trustees and that she could not remove them. Therefore, the trial court found the Siblings entitled to summary judgment on her declaratory judgment counterclaim regarding her ability to act independently. As for Ourania residing in the marital residence, the trial court determined that the trust granted her a life estate in, and exclusive possession of, the residence. The trial court also concluded, however, that she was responsible for paying the associated taxes and expenses. Accordingly, the trial court found the Siblings entitled to summary judgment on their claim that Ourania was not permitted to live in the residence expense free. It found Ourania entitled to summary judgment, however, on her counterclaim that Tom Karras had no right to continue living in the residence.

{¶ 7} With regard to conversion, the trial court found Ourania entitled to summary judgment on the Siblings' claim, as co-trustees, that she improperly had converted the PNC CD referenced above by closing the account and transferring the proceeds to her own account. The trial court reached this conclusion based on its finding that the CD was not a trust asset. The trial court also determined, however, that Maria personally had a conversion claim regarding the CD because Maria and Ourania were both surviving owners of the CD funds. As for Ourania's own conversion counterclaims, the trial court found the Siblings, as co-trustees, entitled to summary judgment. The trial court found a genuine issue of material fact, however, regarding a conversion claim by Ourania against Maria regarding the latter's withdrawal of $21,000 from PNC Checking 8872.

{¶ 8} The trial court next found the Siblings entitled to summary judgment regarding Ourania's concealment counterclaim insofar as it related to trust property. The trial court found the concealment issue viable, however, insofar as it related to estate property, which included items in a safe and an automobile. Finally, the trial court found

Ourania entitled to summary judgment on the Siblings' claim that she had violated no-contest provisions of Andreas' will and the trust. (Doc. #100 at 16-31). Although the trial court's ruling did not dispose of all issues between the parties, Civ.R. 54(B) certification has been affixed.[1]

{¶ 9} In their sole assignment of error on appeal, the Siblings contend the trial court erred in finding that property acquired after July 15, 1992 did not constitute trust property. Their argument concerns the various accounts mentioned above that were opened after the trust was created. The Siblings assert that these accounts were part of the trust for two reasons: (1) valuable consideration was paid for a declaration that all later-acquired property would be held in trust and (2) subsequent to acquiring the accounts, Andreas repeatedly manifested his intent that they were to be included in the trust. Therefore, the Siblings maintain that the trial court erred in entering summary judgment against them on their declaratory-judgment claim that the accounts were trust assets.

{¶ 10} Upon review, we see no error in the trial court's ruling. The Siblings' argument implicates language in the July 15, 1992 trust and a simultaneous assignment purporting to make later-acquired property part of the trust. In relevant part, the trust document reads:

> The Trust is intended by the Trustors to be the recipient of all their assets, whether commonly owned, community, quasi-community, separate or joint, as well as the named Beneficiary of all interests of which the Trustors are, *or may become*, Beneficiaries.

---

[1] At this court's request, the trial court issued a September 7, 2016 entry clarifying that it intended to and did affix Civ.R. 54(B) certification to the decision and judgment entry from which the parties have appealed and cross appealed.

(Emphasis added.) (Doc. #2 at Karras Trust pg. 4).

{¶ 11} The assignment executed by Andreas and Ourania when the trust was created provides:

> We, Andreas G. Karras and Ourania A. Karras, do hereby sell, transfer and assign, without consideration, all right, title and interest which we have in our personal property of every kind, including but not limited to furniture, fixtures, appliances, furnishings, antiques, pictures, china, silverware, glass, books, jewelry, wearing apparel, recreational vehicles, tools, and all policies of fire, burglary, property damage, and other insurance on or in connection with the use of this property, stocks, bonds, mutual funds, certificates of deposit, promissory notes, savings accounts, checking accounts, which we now own *or which we may own in the future*, to:

> The Andreas G. Karras Trust, dated July 15, 1992, Andreas G. Karras and Ourania A. Karras, Trustor(s) and/or Trustee(s).

(Emphasis added.) (*Id.* at Assignment of Furniture, Furnishings, and Personal Effects).

{¶ 12} In their appellate brief, the Siblings assert that "[w]hen and how after acquired property becomes an asset of a trust is an issue of first impression in Ohio." (Siblings' Oct. 15, 2015 brief at 12). They acknowledge the widely-recognized rule, however, that "an interest which has not come into existence or an expectation of hope of receiving property in the future cannot be held in trust." (*Id.*). We agree. The Restatement of Trusts expressly provides that "[a]n expectation or hope of receiving property in the future, or an interest that has not come into existence or has ceased to exist, cannot be held in trust." Restatement (Third) of Trusts § 41 (2003). Restatement

"notes" following § 41 elaborate on this rule:

> *b. Nonexistent interests.* An interest may not be in existence because the thing that would be the subject matter of the interest is not itself in existence or, although the thing exists, no one has an interest in it. In these cases, no one has an interest in anything of which there could be a declaration of trust or a transfer to another in trust. A person can make a promise to create a trust of an interest in such a thing should it thereafter be acquired, but such an agreement is not binding unless the requirements of the law of contracts are satisfied. * * *

> *c. Contractual liability.* If consideration is received for a purported declaration of trust or assignment in trust of a bare expectancy or nonexistent property, the purported declaration or transfer is treated as a contract to create a trust even though it is worded as a present declaration or transfer. * * *

> *d. Intended trust property subsequently acquired.* A person gratuitously purports to declare a trust, or to make a transfer to another in trust, of a bare expectancy or nonexistent property. No trust arises when the person later acquires the intended trust property in the absence of some express or implied manifestation at the later time of an intent to give effect to the trust. * * *

Restatement (Third) of Trusts § 41 (2003) at notes b, c, and d.


{¶ 13} While acknowledging the general rule that later-acquired property is not

trust property, the Siblings argue that the scenarios depicted in notes "c" and "d" above apply here. First, they assert that Andreas' and Ourania's declaration of trust with respect to later-acquired property is enforceable, as a matter of contract law, because it was supported by consideration. [2] Specifically, they contend "[t]he consideration was $200,000 of Andreas' money payable to Ourania and her right to live in the house." (Siblings' brief at 12). Second, the Siblings maintain that the accounts at issue constituted trust property because Andreas repeatedly manifested his intent, after acquiring the accounts, that they were part of the trust.

{¶ 14} Neither argument is persuasive. As set forth above, the 1992 assignment that transferred property into the accompanying trust explicitly stated that the assignment of assets was "without consideration." Moreover, as Ourania correctly points out, the $200,000 mentioned by the Siblings constituted explicit consideration for the 2005 trust amendment referenced above that deleted the creation of the "A/B" aspects of the original trust. Nothing suggests that it was consideration for a contract-based agreement to include later-acquired property as a trust asset. Finally, the Siblings have not demonstrated that Ourania's right to live in the marital residence constituted consideration for any promise to hold later-acquired assets in trust.

{¶ 15} With regard to the second issue, the Siblings contend Andreas repeatedly manifested his intent for the disputed accounts to be included in the trust *after* opening them. In support, they cite Maria Powers' deposition testimony that Andreas told her

---

[2] The Siblings' appellate brief contains several pages of analysis. (*See* Siblings' brief at 7-12). Most of it, however, involves property already in existence at the time of the trust. The Siblings present a single page of argument about later-acquired property and the effect of consideration. (*Id.* at 12).

Ourania would get $200,000 and nothing else from the trust. She claimed Andreas said the Siblings would get "the rest." (Powers depo. at 299). These statements, however, fail to resolve which assets were included in the trust to be divided by the Siblings. When addressing whether the accounts at issue were in or out of the trust, which is the issue before us, the trial court reasoned:

> With respect to the Pioneer IRA, the affidavit of the financial advisor who established the account shows that Andreas intended for the account to pass pursuant to its terms upon his death. Likewise, the documents creating the PNC accounts show that Andreas and Ourania intended for the accounts to pass pursuant to their terms upon the death of one or more of their owners. Significantly, the PNC accounts were designated personal accounts, despite the fact that the documents provided an option to designate them as trust accounts. Additionally, the accounts listed multiple owners with rights of survivorship. Indeed, in some cases, the accounts not only listed multiple owners, but also payable on death beneficiaries. Given that the Siblings do not offer any evidence that a contrary intention was manifested at the time the IRA and PNC accounts were opened, the Court concludes that Ourania is entitled to summary judgment on the Siblings' claim that the Disputed Accounts belong to the Trust.

(Doc. #100 at 18).

{¶ 16} We concur in the trial court's analysis. In her deposition, Maria Powers insisted that Andreas "wanted everything to go in the trust." (Powers depo. at 91). But whatever "everything" may have encompassed, Andreas' actions when setting up the

accounts at issue demonstrate that he did not intend for those accounts to be trust assets. As the trial court correctly noted, the accounts were designated as personal accounts rather than trust accounts and had rights of survivorship and payable-on-death beneficiaries. Such contemporaneous manifestations of intent establish that the accounts were not trust assets. We see no error in the trial court's resolution of the issue. Accordingly, the Siblings' sole assignment of error is overruled.

{¶ 17} In her first assignment of error on cross appeal, Ourania asserts that the trial court erred in finding her and Maria each entitled to one-half of the PNC CD account referenced above. The trial court ruled that two PNC accounts, "PNC checking 8872 and PNC CD 0897" were divided 50/50 between Ourania and Maria. Her cross-appellant's first assignment of error challenges the trial court's ruling regarding "the amounts remaining in the joint and survivorship account**s.**" (Emphasis added.) However, her argument only deals with the CD account. Also the evidence she argues creates a genuine issue of material fact is her affidavit discussing the opening of the CD account with "ou[r] joint funds," not the PNC checking 8872 account. Accordingly, the record supports the trial court decision for a 50/50 split of the checking 8872 account, and we limit our discussion to whether summary judgment was appropriate only to the PNC CD 0897 account.

{¶ 18} Based on our resolution of Siblings' assignment of error, the trial court correctly concluded that the PNC account, which was a joint-and-survivor account, was not a trust asset. In analyzing ownership of the PNC account (and other accounts not at issue here), the trial court reasoned:

> * * * It is well-settled that where there are joint account owners with

rights of survivorship, the surviving owner or owners are entitled to the balance remaining in the account upon the death of one of the owners. [Citation omitted.]. In cases in which it is undisputed that neither of two surviving owners contributed to the account, each is entitled to an equal share of the remaining balance. *Weyand v. Barnes*, 10th Dist. Franklin No. 08AP-857, 2009-Ohio-3239, ¶22. In contrast, in cases in which the surviving owners' contributions are disputed, at least one Ohio appellate court has indicated that each is entitled to her net contribution, plus an equal share of the remaining balance. *Miller v. Miller*, 139 Ohio App.3d 512, 744 N.E.2d 778 (8th Dist.2000).

\* \* \*

\* \* \* Andreas, Ourania, and Maria are joint owners, with rights of survivorship, of PNC Checking 8872 and PNC CD 0897. There is no dispute that Maria did not contribute any funds to these accounts. Maria, citing Ourania's deposition testimony that she was unemployed and financially dependent on Andreas, argues that, likewise, there is no dispute that Ourania did not make any contributions. In response, Ourania alleges that the contributions came from the Trust assets, which were commonly owned pursuant to the Letter of Intent. However, Ourania offers no evidence showing that the Trust was the source of the contributions, and consequently, fails to show that there is a genuine issue of material fact as to her entitlement to the remaining balances. Accordingly, the Court concludes that Ourania and Maria are each entitled to one-half of the

balances remaining in PNC Checking 8872 and PNC CD 0897 at the time of Andreas' death.

(Doc. #100 at 19-20).

{¶ 19} On appeal, Ourania challenges the trial court's award of one-half of the PNC CD account to Maria. Specifically, Ourania contends she presented evidence that she and Andreas opened the PNC CD with "joint funds." Regardless of whether these funds came from the trust or from non-trust assets belonging to Ourania and Andreas personally, Ourania asserts that she was a "joint contributor" of all of the funds in the PNC account. Therefore, she contends she was entitled to 100 percent of the balance. In support of her argument, Ourania refers to the following portion of her summary judgment affidavit in which she averred:

Later, Andreas told me that we would set up an interest-bearing certificate of deposit at PNC Bank. In 2008, we went together and signed the consumer signature card attached at Exhibit B. Maria Powers was not present when we signed it. *These were ou[r] joint funds and we discussed that this entire certificate of deposit was mine in the event of Andreas' death.* We never discussed that my share in the certificate of deposit would be limited or that it was a substitute for anything else I would receive under the Will, the Trust, the Pioneer IRA or any other account.

(Emphasis added) (Doc. #58 at ¶10).

{¶ 20} Upon review, we are persuaded, in part, by Ourania's argument. The case law governing the disposition of the PNC CD is clear. The Ohio Supreme Court summarized this law in *Estate of Cowling v. Estate of Cowling*, 109 Ohio St.3d 276, 2006-

Ohio-2418, 847 N.E.2d 405, as follows:

"The existence of a joint and survivorship bank account raises a rebuttable presumption that co-owners of the account share equally in the ownership of the funds on deposit." *Vetter v. Hampton* (1978), 54 Ohio St.2d 227, 8 O.O.3d 198, 375 N.E.2d 804, paragraph three of the syllabus. This presumption applies in the absence of evidence to the contrary. *Id.* at paragraph four of the syllabus; *see Wright v. Bloom* (1994), 69 Ohio St.3d 596, 602–603, 635 N.E.2d 31. "A joint and survivorship account belongs, during the lifetime of all parties, to the parties in proportion to the net contributions by each to the sums on deposit, unless there is clear and convincing evidence of a different intent." *In re Estate of Thompson* (1981), 66 Ohio St.2d 433, 20 O.O.3d 371, 423 N.E.2d 90, paragraph one of the syllabus; *see* Uniform Probate Code 6–103. We expressly stated that *Thompson* did not "significantly alter our earlier case law" but merely amended our analytic framework to better effectuate "the intent of the parties to create joint and survivorship accounts." *Thompson*, 66 Ohio St.2d at 439, 20 O.O.3d 371, 423 N.E.2d 90. This language indicates that, although we adopted a new presumption for determining ownership of joint and survivorship accounts, the presumption of equal ownership continues to exist when net contributions are not proven. *See* Uniform Probate Code 6–103, Official Comment (courts should "divide the account equally among the parties to the extent that net contributions cannot be proven").

*Id.* at ¶ 12.

{¶ 21} The foregoing case law dictates that, prior to Andreas' death, the funds in the PNC CD account belonged to Andreas, Ourania, and Maria in proportion to their net contributions.[3] Maria concedes that she did not contribute anything to the account. Therefore, if the funds to open the account were in part Ourania's, prior to his death, the funds in the account belonged solely to Andreas and Ourania in proportion to each's net contributions. The evidence in the record about the nature of those contributions is Ourania's affidavit that the funds in the account were "joint funds." She appears to mean that they were marital property. If so, a reasonable interpretation is that she and Andreas each owned 50 percent of the funds that they jointly placed in the CD prior to his death. This conclusion is consistent with the Ohio Supreme Court's recognition in *Cowling* that a joint-and-survivorship account belongs to the parties in proportion to their contribution If ownership of the funds were disputed during Andreas' lifetime, none of the funds would be Maria's property because she admittedly contributed nothing.

{¶ 22} Upon Andreas' death, the funds in the PNC CD belonged to the surviving parties, Ourania and Maria, "in proportion to their previous ownership interests augmented by an equal share for each survivor of any interest the decedent may have owned in the account immediately before his death * * *." *Thompson*, at syllabus paragraph two, overruled on other grounds by *Wright*, supra.[4] Thus, we conclude there

---

[3] "Net contributions" are " 'the sum of all deposits to an account made by or for the party, less all payments from the account made to or for the party which have not been paid to or applied to the use of another party and a proportionate share of any charges deducted from the account, plus a proportionate share of any interest or dividends earned.' " *Cowling*, at ¶ 13, quoting Uniform Probate Code 6–211.

[4] Although *Wright* purports to overrule paragraph two of the syllabus of *Thompson*, that paragraph contains two sentences. *Wright* addressed and overruled the first sentence, which states: "Sums remaining on deposit at the death of a party to a joint and survivorship account belong to the surviving party or parties as against the estate of the

is a genuine issue of material fact whether Ourania is entitled to her percentage of the "joint funds" used to open the account, as well as an equal share, along with Maria, of Andreas' portion of the contribution of funds. Ourania, upon proof that the account was opened with non-specific "joint" funds, could be entitled to 75 percent of the funds in the PNC CD at the time of Andreas' death, and Maria is entitled to 25 percent. Accordingly, Ourania's first assignment of error is sustained to that extent.

{¶ 23} We reject Ourania's additional argument, however, that she should have been granted summary judgment on Maria's conversion claim regarding the PNC CD. The trial court concluded that the conversion claim remained viable because Maria was entitled to 50 percent of the funds in the CD account, which Ourania had closed after Andreas' death. Based on her belief that she is entitled to 100 percent of those funds, Ourania insists that Maria's conversion claim fails as a matter of law. We disagree. Although we have concluded a genuine issue of material fact whether the CD account was opened with "joint funds," Oriania does not claim that the account was opened with her sole money meaning that some amount of the account is Maria's by way of

---

decedent *unless there is clear and convincing evidence of a different intention* at the time the account is created." (Emphasis added.) *Thompson*, at paragraph two of the syllabus. *Wright* eliminated the opportunity to present evidence of a "different intention" and held that funds remaining on deposit at the death of a party conclusively *do* belong to the surviving party or parties. *Wright* at 603 (holding that "survivorship rights under a joint and survivorship account of the co-party or co-parties to the sums remaining on deposit at the death of the depositor may not be defeated by extrinsic evidence that the decedent did not intend to create in such surviving party or parties a present interest in the account during the decedent's lifetime"). *Wright* did not address, and therefore did not overrule, the second sentence of paragraph two of *Thompson's* syllabus, which, as we have noted above, explains how to divide the funds in a joint-and-survivorship account upon the death of one party when multiple surviving parties remain. *Wright* did not address that issue because in *Wright* there was *only one* surviving co-party.

survivorship of Andreas' interest. Therefore, the trial court did not err in allowing Maria's conversion claim to proceed. For the foregoing reasons, Ourania's first assignment of error is sustained in part and overruled in part.

{¶ 24} In her second assignment of error, Ourania contends the trial court erred in declaring (1) that the trust was not responsible for paying real-estate taxes and other expenses related to her use of the marital residence and (2) that, despite her status as the surviving settlor of the trust, she could not act independently of the Sibling co-trustees.

{¶ 25} With regard to the former issue, the trial court held that the trust granted Ourania a life estate in the marital residence. It also held that Ourania was not entitled to live in the residence expense free and that the trust was not obligated to pay her real estate taxes or other expenses. In reaching this conclusion, the trial court found the trust language unambiguous. (Doc. #100 at 24-26). In particular, it quoted two provisions of the trust. The first addresses occupancy of the residence and provides:

> The Trustee may permit any Settlor Beneficiary to occupy rent free any residence constituting a part of the assets of a Trust for such Beneficiary and to pay the real estate taxes thereon, expenses of maintaining said residence in suitable repair and condition and hazard insurance premiums on said residence; provided, however, the Trustee shall not exercise this power in any way which would deprive either Settlor under this Trust of the beneficial enjoyment of the Trust and either Settlor shall have the right to limit, restrict or terminate the Trustee's exercises of this power if it interferes with such beneficial enjoyment.

(Doc. #2 at Karras Trust pg. 21).

{¶ 26} The second trust provision quoted by the trial court states:

The Trustee shall retain in trust the home and furnishings located at 4609 Glenheath Drive, Dayton, Ohio, or the current residence of the Settlors at the time of the death of the Husband, for as long as Ourania A. Karras desires to live therein. If said individual desires other accommodations, the real property is to be sold and the proceeds used to buy such other appropriate accommodations. Such purchase shall remain in the trust. If appropriate, the home and furnishings may be sold and the funds used to provide for a nursing home for said individual. Upon the death of the Surviving Settlor, the home and furnishings, or remaining funds therefrom, shall be allocated and distributed as specified as hereinafter provided to the Primary Beneficiary(s) of the Settlors. The retention of said property is to in no way imply that the Surviving Settlor cannot draw from the equity for future investments, improvements or for the Settlor(s) general welfare. The purpose in retaining the real property in Trust is to benefit the Settlors and to assure the allocation and distribution to the Primary Beneficiary(s) as hereinafter provided.

(*Id.* at 38-39).

{¶ 27} The trial court reasoned:

Read together, these provisions do not disclose any ambiguity regarding whether Ourania is authorized to live in the Residence expense-free. The first provision generally provides that the trustee *may* allow a settlor to occupy any real property held by the Trust expense-free, whereas

the second more specifically directs the trustee to allow Ourania to live in the Residence for as long as she desires to do so, but does not direct the trustee to pay the taxes and expenses incurred by the Residence. The second provision is sufficient to grant Ourania a life estate in, and exclusive possession of, the Residence. [Citations omitted.] With this entitlement, and consistent with the Trust's silence on the issue, comes the responsibility to pay taxes and expenses incurred by the residence. [Citations omitted.] Accordingly, the Court concludes that the Siblings are entitled to summary judgment on their claim that Ourania is not permitted to live in the Residence expense-free and that Ourania is entitled to summary judgment on her claim that Tom is not permitted to remain in the Residence.

(Doc. #100 at 25-26).

{¶ 28} On appeal, Ourania asserts that a primary responsibility of the trustee is to consider her needs as surviving spouse even if that requires invading the trust estate. (*See* Doc. #2 at Karras Trust pg. 14). She also points out that the last sentence of the first provision cited by the trial court give the surviving settlor the right to limit, restrict, or terminate the trustee's power if the trustee interferes with her "beneficial enjoyment" of the trust. Finally, Ourania maintains that it is implausible to read the second provision cited by the trial court as allowing her to sell the residence or draw from the equity while not requiring the trust to pay her property taxes and other expenses.

{¶ 29} As a threshold matter, we note that the trial court's finding regarding Ourania's right to a life estate in the residence is not before us. The Siblings' opening appellate brief did not raise as an issue on appeal the trial court's declaratory judgment

regarding Ourania's right to a life estate. They raise the issue *only* in their reply to Ourania's cross-appeal, which challenges the trial court's finding that the trust is not required to pay all of her housing-related expenses. The Siblings insist that they can raise the life-estate issue to "defend" the trial court's judgment regarding payment of expenses because Ourania has "broached the issue." (Siblings' December 10, 2015 Reply Brief at 3). We disagree. The issue Ourania's cross appeal has broached is the trust's responsibility for paying her housing-related expenses. Whether she enjoys a life estate or merely a license to live in the residence (the issue raised in the Siblings' reply) is not a "defense" to the trial court's declaratory judgment regarding the trust's non-obligation to pay her expenses. If the Siblings desired to challenge the trial court's declaratory-judgment regarding Ourania's life estate, they were required to raise that issue in their own appeal. Because they did not, and because they are raising the issue as a sword to modify the trial court's judgment, the life-estate issue is not properly before us.

{¶ 30} With regard to the issue that is before us, the trial court correctly held that the trust unambiguously is not required to pay Ourania's property taxes or other housing-related expenses. The most pertinent trust provision, the first one cited by the trial court, states: "The Trustee may permit any Settlor Beneficiary *to occupy rent free any residence * * * and to pay* the real estate taxes thereon, expenses of maintaining said residence in suitable repair and condition and hazard insurance premiums on said residence * * *." (Emphasis added.) This language makes clear that Ourania, the settlor beneficiary, enjoys the right to occupy the residence but has the corresponding obligation to pay the expenses. The second trust provision cited by the trial court does not alter this conclusion as it says nothing about the payment of expenses.

{¶ 31} Nor are we persuaded by Ourania's reference to trust language about a primary responsibility of the trustee being to consider her needs as surviving spouse. This general language does not nullify the specific provision directly addressing her occupancy of the marital residence and her payment of associated expenses. Finally, Ourania's reliance on the latter part of the first trust provision quoted by the trial court is unpersuasive. After stating that the trustee may permit Ourania to occupy the residence and to pay the related expenses, the provision adds the following caveat: "however, the Trustee shall not exercise this power in any way which would deprive either Settlor under this Trust of the beneficial enjoyment of the Trust and either Settlor shall have the right to limit, restrict or terminate the Trustee's exercises of this power if it interferes with such beneficial enjoyment."

{¶ 32} We reject Ourania's reliance on the foregoing language for at least three reasons. First, enforcing a requirement for her to pay the associated expenses if she lives in the marital residence cannot, ipso facto, establish a deprivation of her beneficial enjoyment of the trust. Otherwise, the first part of the provision at issue (obligating her to pay those expenses) never could have any force or effect. Second, the issue came before the trial court in the context of a declaratory-judgment action. The issue was whether the trust was obligated to pay the disputed expenses. Based on the plain trust language quoted above, the trust unambiguously is not required to pay those expenses. The fact that, under certain circumstances, a trustee may be able to alter that result does not negate the fact that, at present, the trust, by its own terms, is not required to pay Ourania's housing-related expenses. Third, for the reasons set forth below, we are unconvinced that Ourania may act alone to alter trust provisions she dislikes, even if she believes her

"beneficial enjoyment" is being denied. For each of these independent reasons, the trial court's declaratory-judgment ruling was correct regarding the trust's non-obligation to pay Ourania's housing expenses.

{¶ 33} As we just noted, Ourania's second assignment of error also challenges the trial court's ruling that she cannot act independently and must act in concert with the co-trustee Siblings. Ourania insists that the plain language of the trust allows her to act independently with regard to the trust, its administration, and the disposition of its assets.

{¶ 34} In support, Ourania quotes three trust provisions. They state:

> The above named Settlor Trustees [Andreas and Ourania] shall serve jointly and severally and either shall have full authority for the Trust without the consent of the other, to act independently in performing transactions on behalf the Trust * * *.

(Doc. #2 at Karras Trust pg. 1).

> When there is more than one Successor Trustee acting simultaneously with other designated Trustees, the Co-Trustees so serving must act in concert. This provision does not apply to the Settlor(s).

(*Id.* at 8).

> The Surviving Settlor shall be the Trustee, unless and until, the Trustee resigns in writing, or is determined to be incompetent as per the terms herein provided. The Surviving Settlor continues to retain all absolute rights to discharge or replace any Successor Trustee of any portion or share of the Trust which is revocable by the Surviving Settlor, as long as the Settlor is competent.

(*Id.* at 12).

{¶ 35} Ourania argues that the foregoing provisions are unambiguous and that they allow her to act alone as the surviving settlor, without the concurrence of the co-trustee Siblings. (Ourania's November 4, 2015 brief at 22-23).

{¶ 36} Upon review, we find Ourania's argument unpersuasive. The first provision she cites governs the relationship between the original settlor-trustees, namely Ourania and Andreas. It does not address what occurs after the death of one of the original settlor-trustees. The third provision apparently gives the surviving settlor, Ourania, absolute authority over any portion of the trust that is revocable. In its ruling, however, the trial court correctly recognized that the only revocable portion of the trust was the "A" portion of the original A/B trust, which the 2005 trust amendment eliminated. (Doc. #100 at 24). "Thus, the only Trust presently existing is irrevocable." (*Id.*). Finally, the second provision states that multiple co-trustees must act in concert. This plainly applies to the Siblings. The second provision then adds: "This provision does not apply to the Settlor(s)." It is unclear to us whether this means a settlor need not act in concert with successor co-trustees. In any event, another trust provision clarifies the issue in the present case by explicitly stating that, upon Andreas death, Ourania *is a co-trustee* along with the Siblings. Under the heading "Surviving Trustee," it states:

> In the event of the death of Andreas G. Karras, (an original Trustee) * * * the Trustors nominate and appoint *Ourania A. Karras*, Maria A. Karras, Anastasios A. Karras and Georgios A. Karras to serve as Co-Trustee hereunder with said Surviving Trustee, without the approval of any court.

(Emphasis added.) (Doc. #2 Karras Trust at 7).

{¶ 37} Notably, the trust provided a different outcome if Ourania had predeceased

Andreas. In that circumstance, he would have "serve[d] as sole trustee." (*Id.*). Thus, a fair reading of the trust as a whole is that Andreas and Ourania intended for her to have the assistance of co-trustees (of which she was one) who must act in concert if Andreas predeceased her, but that Andreas was to make his own decisions as "sole trustee" if Ourania predeceased him. No purpose would be served by designating Ourania a co-trustee (who by definition must act in concert with other co-trustees) upon Andreas' death if she simultaneously could disregard the co-trustees' decisions in her role as surviving settlor. In our view, such an interpretation is unreasonable.

{¶ 38} In rejecting Ourania's authority to act independently, the trial court concluded that "[i]n keeping with the intention to limit Ourania's authority with respect to irrevocable trusts, the Court concludes that the Trust, as amended, does not authorize Ourania to act independently as trustee or to remove the Siblings as co-trustees of the Trust. Thus, the Court concludes that the Siblings are entitled to summary judgment on Ourania's claim that she is entitled to act independently as trustee." (Doc. #100 at 24). We see no error in this determination. For the foregoing reasons, Ourania's second assignment of error is overruled.

{¶ 39} In her third assignment of error, Ourania challenges the trial court's entry of summary judgment against her on her conversion counterclaim regarding the contents of a safe. Her argument concerns a safe in the marital residence that the Siblings opened and emptied without her knowledge after Andreas' death.

{¶ 40} In resolving Ourania's conversion claim, the trial court reasoned:

Finally, turning to the Safe Property, it is unclear whether Andreas

owned the property when the Estate Planning Documents were executed and, thus, whether the property belonged to the Estate or to the Trust when it was removed from the safe. To the extent that the property belonged to the Estate, then Ourania, individually and as trustee, cannot show that either she or the Trust owned or had a right to possess the property at the time of the alleged conversion. * * * To the extent the Safe Property belonged to the Trust, there is no dispute that the Siblings' counsel is holding in their trust account the cash that was removed and that the Siblings, as co-trustees, are holding the remaining property until resolution of this litigation. Thus, even assuming that the Siblings' removal of the property was wrongful, Ourania, as trustee cannot show that the Trust has been damaged as a result of the removal.

Based on the foregoing, the Court concludes that the Siblings are entitled to summary judgment on Ourania's conversion claims * * *.

(Doc. #100 at 28).

{¶ 41} On appeal, Ourania contends the trial court's analysis ignored a third possibility, namely "that some or all of the property was After-Acquired Property that belonged to Ourania personally, rather than to the Estate or Trust." (Ourania's November 4, 2015 brief at 24). During her deposition, she testified that Andreas had told her some unidentified "things" in the safe belonged to her. (Ourania depo. at 160). The only specific item Ourania mentioned was a "valuable" silver belt that Andreas had bought her. (*Id.* at 151). She also testified that Andreas had kept cash in the safe along with collectibles and other "things that belonged to him." (*Id.* at 156). Beyond that, she did not know "what

[was] in there." (*Id.* at 165).

{¶ 42} In response to Ourania's argument, the Siblings admit that they removed property from the safe. They insist that the nature of the property is "irrelevant," while acknowledging that it included at least cash and a belt with a buckle. (Siblings' Dec. 10, 2015 brief at 7). The Siblings then reason:

> This claim is not ripe for adjudication. Nothing has been converted as it was removed from an asset of the trust and is being held in trust. Ourania's claim of ownership of it, including her belt buckle [sic] will be addressed at the hearing on disbursement of trust assets.

(*Id.*).

{¶ 43} Upon review, we conclude that the trial court erred in entering summary judgment in the Siblings' favor on Ourania's individual conversion counterclaim. We agree with the trial court that if all the property in the safe belonged to the estate, or the trust, then Ourania has no conversion claim. But we also agree with her argument that if the trial court were to determine that some of the property in the safe was her personal property, then conversion could be appropriate. Ourania's deposition testimony creates a genuine issue of material fact as to whether the Siblings have converted a silver belt that belongs to her personally by removing it from the safe and failing to give her possession of it. Although the Siblings assert that Ourania's conversion claim "is not ripe for adjudication," the trial court *did* adjudicate the claim by granting them summary judgment on it. The Siblings also assert that no conversion occurred because trust assets were removed from the safe and are being held in trust. This argument ignores Ourania's deposition testimony that the silver belt belongs to her personally and the genuine issue

of material fact that it may not be a trust asset at all. Accordingly, we sustain Ourania's third assignment of error solely with regard to the described belt.

**{¶ 44}** Having overruled the Siblings' sole assignment of error on appeal, and having sustained, or sustained in part, two of Ourania's three assignments of error on cross appeal, we affirm in part and reverse in part the trial court's July 28, 2015 judgment entry that, inter alia, sustained in part and overruled in part competing motions for summary judgment and partial summary judgment.

**{¶ 45}** The trial court's judgment is reversed insofar as it entered summary judgment in favor of the Siblings on Ourania's conversion counterclaim regarding the silver belt from the safe. The trial court's judgment also is reversed insofar as it declared Ourania and Maria each entitled to 50 percent of the PNC CD discussed above because there is a genuine issue of material fact whether the CD was acquired with "joint funds." In all other respects, the trial court's judgment is affirmed. Finally, the cause is remanded for resolution of all remaining issues.

. . . . . . . . . . . .

FAIN, J., and WELBAUM, J., concur.

Copies mailed to:

James R. Kingsley
James Papakirk
Howard M. Schwartz
James L. Jacobson
Elizabeth E.W. Weinewuth
Hon. Alice O. McCollum